**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND HOSPITALITY
ASSOCIATION, PRI I, L.P., and PRI XVIII, L.P.,

       v.                            C.A. No. 09-527-ML

CITY OF PROVIDENCE, by and through its
Treasurer, JAMES J. LOMBARDI III

**MEMORANDUM AND ORDER**

Mary M. Lisi, Chief United States District Judge.

The plaintiffs in this litigation are a Rhode Island trade group (the "Association") related to the food service, lodging, restaurant, and tourism industry in Rhode Island,[1] and two privately held real estate investment limited partnerships organized in Delaware: PRI I, L.P. (the "Hilton"), which owns and operates the Hilton Providence, a 274 room hotel in Providence that includes "Shula's 347" restaurant; and PRI XVIII, L.P. ("The Westin"), which owns and operates The Westin Providence, a 564 room hotel that includes the "Centro" restaurant.

The plaintiffs seek to enjoin the enforcement of municipal ordinance Section 2-18.5 (the "Ordinance"), titled "Hospitality

---

[1]

According to the parties, "[I]n financial year 2008, approximately $1.37 billion in wages and salaries were generated by tourism and travel in Rhode Island, which generated some $843 million in federal, state, and local government taxes in 2008, representing some 13.8 percent of all state and local tax revenue. Travel and tourism spending within the City of Providence represents 28.4 percent of the state' [sic] travel and tourism spending." Agreed Statement of Facts 14, 15.

Business Protection and Worker Retention", which was enacted by the City of Providence (the "City") on October 21, 2010 and made retroactively effective to October 26, 2009 with respect to some, but not all, of the affected businesses. The Ordinance sets forth various requirements regarding "the retention of hospitality employees when ownership or management of hospitality businesses change." Ordinance Preamble.

The parties have submitted an agreed statement of facts ("SOF") and have stipulated that the Court will decide the case on its merits based on that submission. SOF, Docket No. 44; February 18, 2010 Order. Two related service worker unions, a group of hospitality employees, and several community organizations (collectively, the "*amici*") have filed an *amicus curiae* brief. The Court conducted two separate hearings at which counsel for both parties and the *amici* supported their respective position with oral arguments and addressed questions posed by the Court.

## I. Factual Background and Procedural History

An earlier version of the Ordinance (the "First Ordinance") was enacted by the City on October 15, 2009. SOF 7. The First Ordinance applied to "any hotel or food service operation within the property of" the Dunkin' Donuts Center ("DDC"), the Rhode Island Convention Center ("RICC"), and the Veterans Memorial Auditorium ("VMA"), as well as any physically connected buildings[2]

---

[2]

Based on this definition, the affected hotels appear to have included the Hilton, The Westin, and the Providence Renaissance.

"by internal walkways, skybridges, or parking lots (including streets that are closed to public traffic to facilitate parking or other functions)", with the express exception of Providence Mall. SOF Ex. A. Pursuant to the First Ordinance, a new owner of a hospitality entity was required, *inter alia*, to retain qualifying employees (including certain qualifying supervisors) for a minimum period of six months; pay them a prescribed minimum wage; rehire from a preferential hiring list; and retain employees based on seniority, all subject to enforcement remedies including back pay, treble damages and attorneys fees to a prevailing employee. SOF Ex. A, First Ordinance ¶¶ (c), (e).

On November 4, 2009, the RICC Authority filed a complaint in this Court, alleging preemption under the National Labor Relations Act ("NLRA") and Rhode Island State labor law, violations of the Contracts Clause and the Equal Protection Clause of the United States Constitution, and of the Home Rule Charter Authority. Subsequently, the Association, The Westin, and the Hilton were added as party plaintiffs, and the complaint was amended accordingly. At a Rule 16 conference, the parties agreed to submit their case for judgment on an agreed statement of facts and submitted memoranda. The *amici* were granted the opportunity to file an *amicus curiae* brief, in which they expressed their support for the Ordinance.

On June 28, 2010, the Court held the first hearing in the matter. The plaintiffs argued that the First Ordinance was subject

to both <u>Garmon</u>[3] and <u>Machinists</u>[4] preemption; that a mandated minimum wage constituted the imposition of a contractual term; that the First Ordinance imposed an obligation to bargain on a successor employer; that supervisors should be excluded under the NLRA; and that regulation of the RICC was reserved to the State.

The City, conceding that supervisors and managers should not have been included in the First Ordinance, encouraged the Court to follow the severance provision therein and to strike only any offending provision while keeping the remainder intact. The City also rejected the plaintiffs' preemption arguments and maintained that the First Ordinance merely set minimum labor standards and did not automatically impose collective bargaining obligations on a successor employer.

Within a month after the hearing, the City informed the Court that an amendment to the First Ordinance, that was "directly responsive" to some of the objections raised by the plaintiffs, had been introduced to the City Council. City's letter dated July 27, 2010. The current version of the Ordinance was enacted on October 21, 2010. Most significantly, the new version exempts the RICC from its regulation; it eliminates the minimum wage provision; it is no longer applicable to supervisors; and the period during which

---

[3]
<u>San Diego Bldg. Trades Council v. Garmon</u>, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

[4]
<u>Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Emp't Relations Comm'n</u>, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

a successor employer must retain a predecessor's employees has been significantly shortened. SOF Ex. B, Ordinance.

After a conference with counsel for the parties, the parties stipulated to a dismissal of all claims by the RICC Authority and agreed to substitute the Association, The Westin, and the Hilton as plaintiffs. On December 9, 2010, the plaintiffs filed a second amended four-count complaint (the "Complaint"), together with an amended agreed statement of facts on behalf of the parties. In Count I, the plaintiffs seek a declaration that the Ordinance is preempted by the NLRA on the grounds that (1) the Ordinance "impermissibly interferes with the contractual relationships and ongoing negotiations which exist between The Westin and the Union,[5] as well as those existing between the Providence Biltmore[6] and the Union" and (2) the Ordinance "unlawfully interferes with the collective bargaining process." Complaint ¶¶ 41, 46. In Count II, the plaintiffs seek a declaration that the Ordinance violates the Contract Clause's prohibition against governmental interference with contractual relationships. Id. ¶ 55. In Count III, the plaintiffs seek a declaration that the Ordinance violates the Equal Protection Clause because it "impermissibly differentiates between businesses that engage in 'hotel service' and those that engage in

---

[5] Local 217, Hotel Restaurant Employees and Bartenders Union n/k/a Local 217 UNITE HERE (the "Union"). A collective bargaining agreement ("CBA") between The Westin and the Union was entered into on November 1, 2005 and expired on October 31, 2009. SOF 11.

[6] The Providence Biltmore is a union employer and is also signatory to a CBA with the Union. SOF ¶ 12.

every other kind of business." Id. ¶ 59.  Finally, in Count IV, the plaintiffs seek a declaration that, by enacting the Ordinance, "the City has exceeded its authority to pass laws concerning local issues." Id. ¶ 63.  The plaintiffs seek an order (1) declaring that the Ordinance is preempted by the NLRA, that it is unconstitutional, and in violation of the City's home rule charter, and (2) preliminarily and permanently enjoining enforcement of the Ordinance.

On January 18, 2011, the parties and the *amici* filed supplemental memoranda in support of their respective positions regarding the amended provisions in the Ordinance. The Court conducted a second hearing on March 7, 2011, after which it took the matter under advisement.

## II.  The Ordinance

In its preamble, the Ordinance declares that

"the wholesale displacement of employees through transfers of hotel operations in New England in the recent past has caused great public outcry, and has caused immeasurable damage to the reputation of the tourist industry in the regional economy."

The stated purpose of the Ordinance is "to bolster Providence as a tourist destination, and to promote the stability of Providence's hospitality and tourism businesses."  Ordinance (1)(a).  The Ordinance defines "Hospitality Business" as including any hotel or like facility and any "inhouse component" which supplies "sleeping or housekeeping accommodations", "which is

operating within the City of Providence with at least 25 rooms."[7] In addition, the Ordinance states that "Hospitality Business covered by the October 26, 2009 Ordinance means any hotel within the property of the [DDC], the [RICC], and [VMA], or within any building physically connected" to these facilities, "with the exception of the Providence Place Mall, and any instrumentality of the State of Rhode Island, including the [RICC]."[8]

The Ordinance is applicable to any employee of an included hospitality business who works an average of at least twenty hours per week (including part-time, on-call, on vacation, or on leave of absence) and whose employment is of at least two months duration. Ordinance (b), (c). The Ordinance applies in the event of a change in the identity of the employer at a hospitality business, defined as "any event or sequence of events (including a purchase, sale, lease, or termination of a management contract or lease) that

---

[7]

The parties agree that the following hospitality businesses are currently affected by the Ordinance: Courtyard by Marriott, Hampton Inn & Suites, the Hilton, the Hotel Providence, the Providence Biltmore Hotel, the Providence Marriott Downtown, the Renaissance Providence Hotel, and The Westin. SOF 10. With the exception of The Westin and the Providence Biltmore Hotel, these hospitality businesses are currently non-union employers and do not recognize any union as the collective bargaining representative of their employees. SOF 13.

[8]

The distinction made between hospitality businesses in general, and those covered by the First Ordinance relates to the two differing effective dates of the Ordinance. See Ordinance Section 2.

causes, <u>within a one-year period</u>,[9] the identity of the hospitality employer at a hospitality business to change." Ordinance (b) (emphasis added).

If such an identity change occurs, the Ordinance provides:

> the new employer (whether the hospitality business owner or its manager) shall retain for at least three (3) months after the commencement of operation of the hospitality business under the new hospitality business employer, those employees who were employed for at least two (2) months preceding the date on which the previous hospitality business employer's status as employer terminated. During such three-month period, employees so hired shall be employed <u>under the terms and conditions established by the hospitality business buyer or manager</u> or as required by law. Hospitality employers shall have the right to discharge any employee during this three-month period for good cause. Ordinance (c)(1) (emphasis added)*.*

At the second hearing, counsel for the *amici*, which include the Union (UNITE HERE Local 217) and the Service Employees International Union Local 615, agreed that nothing in the Ordinance binds the successor employer to an existing CBA. He further clarified that, while the new employer is required to retain a predecessor's employees subject to a "just cause" right to discharge, the Ordinance does not tie the employer's hands with respect to establishing the terms and conditions of employment. According to the *amici*, the Ordinance only provides a right of first refusal to the qualifying individual employee, even if the position is at a much lower salary than had previously been paid,

---

[9] Upon question by the Court, counsel for the City attempted to explain this portion of the provision; however, the timing of the applicability of the Ordinance remains open to interpretation.

with none of the attendant benefits that had been negotiated under the existing CBA.[10]

The Ordinance further provides:

> If <u>at any time</u> the new hospitality business employer determines that fewer employees are required for its full operation than were required by the previous hospitality business employer, the new hospitality business employer may retain that number of employees needed for its new operation. Ordinance (c)(2) (emphasis added.)

At the same hearing, counsel for the City, upon question by the Court, agreed that, pursuant to the language of this provision, a new hospitality business employer was free to retain only the number of employees needed for its full operation "at any time," including the first 90 days of ownership (or new management). The new hospitality business employer could not, however, replace all existing employees with his own workforce during the first 90 days.

Under the Ordinance, both employers and employees retain the right to engage in strike or lockout. Ordinance (d)(1). An employee "who has not been retained or who has been discharged in violation" of the Ordinance may commence litigation against an hospitality business employer "no later than within three years of the violation." Ordinance (e)(1). Remedies include back pay for each day the violation continues, treble damages "if the

---

[10]

Counsel for the amici candidly acknowledged that, if a new employer were, in fact, to reduce salaries and benefits as currently permitted under the Ordinance, the amici would likely challenge such conduct. He suggested, however, that, as long as the NLRB General Counsel followed the precedent set by previous NLRB decisions, the Union would have no right of private action under such circumstances.

hospitality business employer's violation is shown to be willful," and costs and attorney's fees if the employee prevails.  Ordinance (e)(1)(i), (ii), (e)(2).

The effective date of the Ordinance is October 26, 2009 "as to any Hospitality Business covered by the October 26, 2009 Ordinance.[11]  As to the other Hospitality Business[es], this ordinance and its amendments are effective on the date of passage of these amendments to this Ordinance."  Ordinance Section 2. Finally, the Ordinance contains a severability clause, pursuant to which, "[i]f any provision of [the Ordinance] is held to be unenforceable by a court of competent jurisdiction, all remaining provisions shall remain in force."  Ordinance (1)(f).

### III. Standard of Review

As previously stated, the parties in this matter agreed to submit this case to the Court on an agreed statement of facts, which was duly submitted to the Court.  Where, as here, the relevant facts have been fully developed and the issue in dispute is solely a question of law, *i.e.* the validity of the Ordinance, such a procedure is appropriate.  <u>Garcia-Ayala v. Lederle Parenterals, Inc.</u>, 212 F.3d 638, 644 (1st Cir. 2000)("Instead of

---

[11]
The Westin, the Hilton, and the Providence Renaissance appear to be the only hotels affected by the First Ordinance. Accordingly, the Ordinance is retroactively effective only with respect to these three hotels - to a date five days prior to the expiration date of the then current CBA between The Westin and the Union. With respect to any other Providence hotel with at least 25 rooms, the effectiveness date of the Ordinance is October 21, 2010.

expending time and money on a trial, the parties may decide that the pre-trial record establishes all the necessary grounds upon which a judge may enter a final ruling on one or all of the issues in dispute. . . They are, in essence, skipping trial and proceeding directly to judgment, submitting the case to the judge as stated.") (citation omitted); <u>See</u> 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2720, at 339 ("As a practical matter, of course, this procedure amounts to a trial of the action and technically is not a disposition by summary judgment."); <u>Midpoint Service Provider, Inc.</u>, 256 F.3d 81, 86 (2d Cir. 2001)("a district court, with the consent of the parties, may decide a case without a formal trial based on written submissions.")

When an agreed statement of facts has been submitted to the Court, "'such agreed statement would be taken as an equivalent of a special finding of facts,'" which requires "'a finding or agreement upon all ultimate facts, and the statement must not merely present evidence from which such facts or any of them may be inferred.'" <u>Perry v. Wiggins</u>, 57 F.2d 622, 623-24 (8th Cir. 1931)(quoting <u>Wayne County Supervisors v. Kennicott,</u> 103 U.S. 552, 26 L.Ed. 486 (1880)).

The Court notes that neither party has addressed the question of whether this case is justiciable at this time and whether the

plaintiffs' claims are ripe for adjudication.[12]  The Court has a
duty, however, to inquire, *sua sponte*, whether any impediment
exists to its exercise of jurisdiction over the matter.
Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno, 604 F.3d
7, 15-16 (1st Cir. 2010).  Therefore, before considering the merits
of their claims, the Court must decide whether the plaintiffs have
presented an "actual controversy" as required under Art. III of the
Constitution and the Federal Declaratory Judgment Act, 28 U.S.C. §
2201.  See e.g. Steffel v. Thompson, 415 U.S. 452, 458, 94 S.Ct.
1209, 39 L.Ed.2d 505 (1974).

Under the two-pronged test for ripeness established in Abbott
Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-
16, 18 L.Ed.2d 681 (1967), the Court is required to consider "both
the 'fitness' of the issues for judicial decision and the
'hardship' to the parties of withholding review."  Chamber of
Commerce of U.S. v. Reich, 57 F.3d 1099, 1100 (D.C. Cir. 1995).
"Purely legal questions," however, are "presumptively [fit] for
judicial review."  Id.

Here, the City has not challenged the plaintiffs' standing and
both parties have agreed that the validity of the Ordinance is a
purely legal determination that is appropriate to be summarily
decided.  With respect to "hardship," the plaintiffs have asserted

_____

[12]
The City, in its answer to the Complaint, blankly denies the
plaintiffs' assertion of jurisdiction and venue, but it neither
sought to dismiss the case for lack of jurisdiction, nor did it
address the justiciability of the case in its memoranda.

in their Complaint that the Ordinance "impermissibly interferes with the contractual relationships and ongoing negotiations" between the Union and some of the affected hospitality businesses. Complaint ¶ 41. The plaintiffs also assert that the Ordinance currently constrains the affected businesses in their respective efforts "to attract vendors who may be able to provide hotel and restaurant services in a more efficient and cost-effective manner." Id. at ¶¶ 45-46. Although the City has summarily denied these assertions in its answer to the Complaint, no further argument regarding the plaintiffs' standing has been developed.

Based on the posture and circumstances of this litigation, the Court is of the opinion that the case is ripe for a decision on the merits. This conclusion is supported by the fact that the Ordinance became effective immediately on passage[13]; the case involves purely legal issues; and all affected parties are present in this litigation. See Riva v. Commonwealth of Massachusetts, 61 F.3d 1003, 1010-11 (1st Cir. 1995).

**IV. Discussion**

A.   Preemption under the National Labor Relations Act

1.   General Principles

The plaintiffs assert that the Ordinance is invalid both under

---

[13]

Although the preamble to the Ordinance states that it becomes effective on November 1, 2010, Section 2 therein provides that, except for those Hospitality Businesses covered under the First Ordinance, "this ordinance and its amendment are effective on the date of passage." According to the City Council Stamp affixed to the Ordinance, the date of "FINAL READING READ AND PASSED" is October 21, 2010. Ordinance Page 6.

<u>Machinists</u> and <u>Garmon</u> preemption principles because its worker retention provision "has far-reaching implications for the collective bargaining process and the employer's rights under the [NLRA]." Pltfs.' Mem. 4. In response, the City maintains that the Ordinance, like "similar minimum labor standard legislation," is not federally preempted and that it has "nothing to do with the parties' right to organize and/or collectively bargain." City's Mem. 3.

Generally, "the NLRA preempts state and local efforts to regulate labor-management relations." <u>South Bay Boston Mgmt. v. Unite Here, Local 26</u>, 587 F.3d 35, 40 (1st Cir. 2009)(NLRA preemption applies equally to city as well as to state regulations). The Supreme Court has articulated two distinct NLRA pre-emption principles. <u>Metropolitan Life Ins. Co. v. Massachusetts</u>, 471 U.S. 724, 748-749, 105 S.Ct. 2380, 2394,85 L.Ed.2d 728 (1985).

<u>Garmon</u> preemption prohibits States from regulating "activity that the NLRA protects, prohibits, or arguably protects or prohibits." <u>Wisconsin Dept. of Industry v. Gould, Inc.</u>, 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986)(citing <u>San Diego Bldg. Trades Council v. Garmon</u>, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). "The <u>Garmon</u> rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." <u>Golden State Transit Corp. v. City of Los Angeles</u>, 475 U.S. 608,613-614, 106 S.Ct. 1395, 1398, 89

L.Ed.2d 616 (1986)(citations omitted).

In addition, <u>Machinists</u> preemption "precludes state and municipal regulation 'concerning conduct that Congress intended to be unregulated.'" <u>Golden State Transit Corp. v. City of Los Angeles</u>, 475 U.S. at 614 (quoting <u>Metropolitan Life Ins. Co. v. Massachusetts</u>, 471 U.S. at 749, 105 S.Ct. at 2394). "Although the labor-management relationship is structured by the NLRA, certain areas intentionally have been left 'to be controlled by the free play of economic forces.'" <u>Golden State</u>, 475 U.S. at 614 (quoting <u>Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Emp't Relations Comm'n</u>, 427 U.S. at 140, 96 S.Ct. at 2553)). "The Court recognized in <u>Machinists</u> that 'Congress has been rather specific when it has come to outlaw particular economic weapons,' and that Congress' decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional balance 'between the uncontrolled power of management and labor to further their respective interests.'" <u>Golden State</u>, 475 U.S. at 614 (quoting <u>Machinists</u>, 427 U.S. at 146, 96 S.Ct., at 2556, quoting <u>Teamsters v. Morton</u>, 377 U.S. 252, 258-259, 84 S.Ct. 1253, 1257-1258, 12 L.Ed. 2d 280 (1964)).

2. Obligations of a Successor Employer

The Supreme Court determined in <u>NLRB v. Burns</u> that nothing in the federal labor law 'requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer." <u>NLRB v. Burns Int'l</u>

<u>Sec. Serv., Inc.</u>, 406 U.S. 272, 281 n. 5, 92 S.Ct. 1571, 1579 n.5, 32 L.Ed.2d 61 (1972)(noting that "[h]owever, an employer who declines to hire employees solely because they are members of a union commits a [Section] 8(a)(3) unfair labor practice"). The Supreme Court acknowledged that "[a] potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, . . . and nature of supervision." <u>Id.</u> <u>See</u> <u>Howard Johnson Co., Inc. v. Hotel and Restaurant Emps.</u>, 417 U.S. 249, 264, 94 S.Ct. 2236, 2244, 41 L.Ed.2d 46 (1974)(recognizing "the new employer's right to operate the enterprise with his own independent labor force"); <u>Fall River Dyeing & Finishing Corp. v. NLRB</u>, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987)("[S]uccessor is under no obligation to hire the employees of its predecessor," subject to prohibition against union animus).

Pursuant to the "successorship doctrine," an employer who acquires the operations and retains employees of a predecessor is required to participate in bargaining with the union representing the predecessor's employees if (1) the business of both employers is essentially the same; and (2) a majority of the new employer's employees consist of the predecessor's employees. <u>Fall River Dyeing & Finishing Corp. v. NLRB</u>, 482 U.S. at 41, 107 S.Ct. at 2234, 96 L.Ed.2d 22. Generally, a new employer is considered a "successor employer" if there is "'substantial continuity of identity in the business enterprise' before and after a change of ownership." <u>Howard Johnson Co. v. Hotel Employees</u>, 417 U.S. 249,

263, 94 S.Ct 2236, 2244, 41 L.Ed.2d 46 (quoting <u>John Wiley & Sons,</u> <u>Inc., v. Livingston</u>, 376 U.S. 543, 580, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964)). Such continuity of identity, when examined under a totality of the circumstances standard, "necessarily includes . . . a substantial continuity in the identity of the work force across the change in ownership." <u>Howard Johnson Co., Inc. v.</u> <u>Hotel and Restaurant Employees</u>, 417 U.S. at 263, 94 S.Ct. at 2244.

The buyer of an enterprise who is deemed to be a "successor employer" may be compelled to arbitrate with the bargaining representatives of the seller's employees. <u>Id.</u> at 262-263. In other words, retaining all of the predecessor's employees is a decisive factor in determining whether the new business employer has an obligation to bargain with the representatives of those retained employees who are unionized. <u>Fall River Dyeing &</u> <u>Finishing Corp. v. NLRB</u>, 482 U.S. at 41, 107 S.Ct. at 2234, 96 L.Ed.2d 22 ("[T]o a substantial extent the applicability of Burns rests in the hands of the successor. If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of § 8(a)(5) is activated.").

As held in <u>Burns</u>, however, "a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor." <u>Burns</u>, 406 U.S. at 294-295. While a successor employer may be required to bargain, it is not required to adhere to the terms of a CBA previously negotiated by a predecessor. "The source of [the successor employer's] duty to bargain with the union

is not the [CBA] but the fact that it <u>voluntarily</u> took over a bargaining unit." <u>Burns</u>, 406 U.S. at 287 (emphasis added). "Although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them." <u>Id.</u> at 284. <u>See</u> <u>Cora Realty Co.</u>, 340 NLRB 366 (2003)("[U]nless the new company voluntarily and with the consent of the Union, assumes the predecessor's [CBA], it has no contractual obligations to the employees or the Union.")

The <u>Burns</u> Court carved out an exception by stating that, when "it is perfectly clear that the new employer plans to retain all of the employees in the unit . . . it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." <u>Id.</u> At 295. <u>See</u> <u>Cadillac Asphalt Paving Co.</u>, 349 NLRB 6 (2007)(Successor voluntarily retaining all or substantially all of the predecessor's employees had obligation to bargain prior to setting terms); <u>Spruce Up Corp.</u>, 209 NLRB 194, 195 (1974)(<u>Burns</u>' "perfectly clear" standard is "restricted to circumstances in which the new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change" in their terms of employment or "has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.")

3. Other Worker Retention Statutes

The City argues that ordinances similar to the one at issue in this litigation have been upheld in at least two jurisdictions. Alcantara v. Allied Props., LLC, 324 F. Supp.2d 336 (E.D.N.Y. 2004) relates to the New York Displaced Building Service Workers Protection Act ("DBSWPA"), § 22-505 of the Administrative Code of New York City, enacted by the City of New York in November 2002 "to mitigate the harsh economic aftershocks of the devastating terrorist attack of September 11, 2001." Alcantara v. Allied Properties, LLC, 324 F. Supp.2d at 339. The DBSWPA affords building service workers 90 days' continued employment by a new building owner. In granting the displaced workers' motion to remand the case to state court, the district court determined that neither Garmon preemption nor Machinists preemption supported removal to federal court. The district court also stated that, "[e]ven assuming, arguendo, that Machinists preemption is a proper basis for removal, the [DBSWPA] is not preempted by the NLRA" because it "operates completely independently of collective bargaining in the exercise of municipal police powers" and "does not conflict with or inhibit the bargaining or dispute resolution process established by the NLRA." Id. at 345.

Alcantara, however, is not particularly helpful to the analysis in the case now before the Court. First, the case was set against the extreme circumstances of September 11, which established an extraordinary need to protect the employment of a particular group of displaced workers. In addition, the procedural posture of Alcantara required only a preliminary analysis regarding

federal preemption in order to determine whether that case should be remanded to the state court. Finally, the decision of the district court in another jurisdiction, while instructive, does not constitute binding precedent for this Court.

Another worker retention law, after which the Ordinance in this case was "expressly patterned", see City's Reply Mem. 6, was upheld by the Court of Appeals for the District of Columbia Circuit in Washington Serv. Contractors Coal. v. District of Columbia, 54 F.3d 811 (D.C. Cir. 1995). In Washington Serv. Contractors, the Council of the District of Columbia enacted the Displaced Workers Protection Act ("DWPA"), requiring private "contractors who provide certain type of services to retain many of their predecessors' employees after the contractors have taken over service contracts." Washington Serv. Contractors Coal. v. Dist. of Columbia, 858 F.Supp. 1219 (D.D.C. 1994).

The stated purpose of the DWPA, which was applicable to "food, janitorial, maintenance, or nonprofessional health care services," was described as follows:

> "to prohibit contractors or subcontractors who acquire or provide services under a negotiated or competitive bidding procedure from displacing employees employed by the contractor or subcontractor who [lost] or gave up the contract by establishing a 90-day probationary period during which the contractor or subcontractor is prohibited from terminating an employee except for just and sufficient cause." Id. at 1222.

In addition to requiring the retention of existing employees for a 90-day period, the DWPA contained a number of provisions that were part of the First Ordinance at issue in the instant case and

-20-

that are no longer present in the current Ordinance, *i.e.*, requiring the new employer to perform written performance evaluations and offer continued employment to employees with satisfactory performance; and retaining employees by seniority, should it be determined that fewer employees are required to perform the new contract. Other provisions present in the DWPA that have been retained in the Providence Ordinance are the award of back pay for wrongful discharge and recovery of costs and attorney's fees.

Initially, the district court in <u>Washington Serv. Contractors Coal.</u> determined that the DWPA was preempted by the NLRA because it "attempted to regulate an area that Congress has left unregulated and does so in a way that upsets the traditional balance of power in labor relations." <u>Id.</u> at 1230. The district court reasoned that requiring contractors to retain all of a predecessor's employees would impose an immediate duty to bargain over the terms of employment. <u>Id.</u> at 1227. Because the DWPA restricted an employer's freedom to make hiring decisions and because the DWPA's collateral impact on collective bargaining altered the balance of power between labor and management, the district court concluded that the DWPA was preempted by the NLRA. <u>Id.</u> at 1229.

The Court of Appeals for the District of Columbia Circuit disagreed. With regard to the argument that the DWPA impermissibly intruded on employers' collective bargaining rights, <u>Washington Serv. Contractors Coal. v. Dist. of Columbia</u>, 54 F.3d at 816-817, the D.C. Circuit stated:

"[w]ere a contractor to be required by the DWPA to retain its predecessors' union employees as a majority of its workforce, it is not at all clear whether the NLRB would oblige the new employer to bargain with the union of its predecessors' employees. . . [w]here the employer has been required by local law to hire a majority of predecessors' employees, the NLRB may or may not impose successorship obligations on the new employer. We will not know until the NLRB addresses the issue." Id.

The Court further suggested that, if the NLRB decided that the successorship doctrine did not apply under such circumstances, the alleged conflict between the local law and the NLRA would disappear. If, on the other hand, the NLRB should decide that the successorship doctrine applies, "it is difficult to see how appellees could argue that the result would invoke 'conflict' between the DWPA and the NLRA" because such a ruling "would presumably represent the [NLRB's] judgment that enforcing its successorship requirement in the context of DWPA hires would be congruent with the aims of the NLRA." Id. at 817. The Court also rejected the appellees' argument that the DWPA was preempted under Machinists "because the NLRA demonstrates Congress's desire that hiring decisions be left to the 'free play of economic forces.'" Id. According to the D.C. Circuit, Machinists "does not preempt local regulation of any facet of the employment relationship, but rather only those laws that disturb the labor dispute resolution system established by the NLRA." Id.

The D.C. Circuit specifically referred in its analysis to Metropolitan Life Ins. Co. v. Massachusetts, which involved a Machinists challenge to a state law mandating minimum health

benefits that, otherwise, would have been subject to bargaining between the parties. _Metropolitan Life Ins. Co. v. Massachusetts_, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). In _Metropolitan Life_, the Supreme Court declined "to apply _Machinists_ preemption to state employee protective legislation applicable outside the bargaining contest." _Washington Serv. Contractors Coal. v. District of Columbia_, 54 F.3d at 817 (citing _Metropolitan Life Ins. Co. v. Massachusetts_, 471 U.S. at 754, 105 S.Ct. at 2396-97, 85 L.Ed.2d 728)). Holding that the DWPA, like the public law in _Metropolitan Life_, constituted "substantive employee protective legislation having nothing to do with rights to organize or bargain collectively," the D.C. Circuit concluded that the DWPA was not preempted by the NLRA. _Washington Serv. Contractors Coal. v. District of Columbia_, 54 F.3d at 817-818.[14]

Although the D.C. Circuit in _Washington Serv. Contractor_ suggested that it was unknown whether the NLRB would impose successorship obligations on a new employer who was compelled by local law to retain his predecessor's employees, the question is no longer posed in the abstract. As the plaintiffs have pointed out, following _Washington Serv. Contractors_, at least two administrative

---

[14]

The dissent in _Washington Service Contractors_ (Sentelle, J.) agreed with the district court that the DWPA intruded on an area where conduct had been "left by Congress to the free play of economic forces" and concluded that, because the NLRA did not require that "an employer who submits the winning bid for a service contract . . . [is] obligated to hire all of the employees of the predecessor," _Machinists_ preemption applied. _Id._ at 820 (citations omitted).

law judges ("ALJ") have applied the successorship doctrine to new business employers subject to local worker retention laws and, in both instances, have deemed new employers obligated to participate in collective bargaining.   In both cases, the new business employers argued, unsuccessfully, that local laws compelled them to retain their employees and that the mandatory nature of this requirement should be considered in the NLRB's analysis of whether the successorship doctrine applied.   M&M Parkside Towers LLC , 29-CA-27720 (2007), 2007 WL 313429; United States Serv. Indus., Inc., 5-CA-24575 (1995), 1995 WL 1918207.[15]

M&M Parkside involves the DBSWPA previously affirmed in Alcantara.  As in the instant case, although the DBSWPA requires a purchaser to retain its predecessor's employees for 90 days, it does not require the new employer to maintain previously negotiated wages or terms of employment.  Upon acquisition of an apartment building on January 5, 2006, M&M Parkside retained all building maintenance employees at their existing wage rates, but did not

---

[15]   The plaintiffs also point to the ALJ's decision in Windsor Convalescent Ctr. of North Long Beach, 351 NLRB No. 44, 351 NLRB 975 (2007) for the proposition that "the substantial and long-lasting effects on the collective bargaining process of a successor employer's hiring of its predecessor's employees attach on the first day of its taking over operations." Pltfs.' Mem. 4, Pltfs.' Reply 16.   While the ALJ, in that case, did determine that an employer who had purported to hire its predecessor's employees on a 90-day temporary basis only was bound by the existing CBA, the employer had hired the employees voluntarily and not under the mandate of a worker retention statute.  On appeal from the ALJ's determination, the Court of Appeals for the District of Columbia Circuit disagreed, holding that the successor employer was free to implement its own initial terms and conditions of employment.  S&F Market Street Healthcare, LLC, 570 F.3d 354 (D.C.Cir. 2009).

remit union dues or contributions to their union.  M&M Parkside rejected the union's demand to recognize the existing CBA, asserting that it was not a successor and not bound by the CBA. Three weeks after the initial 90 day period had passed, M&M Parkside offered permanent employment to the employees and, at the same time, decreased the employees' wages and issued new work rules without first notifying or negotiating with the union.

The union filed a complaint against M&M Parkside.  After considering the facts, the ALJ concluded that, because M&M Parkside had hired all of its predecessor's employees, it was a successor with an obligation to recognize and bargain with the union.  M&M Parkside Towers LLC , 29-CA-27720 (2007), 2007 WL 313429 at *4,*9. The ALJ rejected M&M Parkside's argument that it had been compelled to hire its predecessor's employees under the DBSWPA.  He recognized that "under the NLRA, an employer . . . is not obligated to hire all or even a portion of a predecessor's employees when it takes over an operation," id. at *4, and he suggested that an argument that a purchaser "somehow violated some unfair labor practice provision of the NLRA because it did not follow a State or Municipal law that required an employer to hire these employees, that argument would fail because the federal law would trump the State or local law on that issue." Id. at *8.[16]  The ALJ held that, once an employer has hired its predecessor's employees, "for

<hr>

16

The ALJ noted that he had no opinion on whether a new employer could refuse to comply with the local law and argue that such law was pre-empted by the NLRA.  Id. at *4 n.4.

*whatever* reason," it has an obligation to bargain with union representing those employees. Id. at *4-5 (emphasis in original)("It simply does not matter why [M&M Parkside] chose to hire the predecessor's employees.")

The General Counsel took the position that, although the local law "is not relevant in determining *if* [M&M Parkside] became a successor . . . it should be considered as to *when* [M&M Parkside] became a successor." Id. at *5 (emphasis in orginal). According to the General Counsel, M&M Parkside had no obligation to recognize or bargain with the union during the first 90 days of employment (April 5, 2006), after which "the DBSWPA ceased to exist for all practical purposes." Id. The ALJ disagreed, concluding that the employees became permanent only when M&M Parkside offered them employment (April 28, 2006), at which time M&M Parkside became a successor under the NLRA. Id. at *7.

The ALJ also concluded that a new employer who qualifies as a successor under Fall River Dyeing, "incurs only the obligation to recognize and bargain with the Union that represented the employees. It does not incur any obligation to adopt or assume the predecessor's labor contract. It is free to negotiate a new agreement." Id. at *8.

The issue of the effect of a worker retention law, if any, on successorship obligations was further addressed in United States Serv. Indus., Inc., 5-CA-24575 (1995), 1995 WL 1918207. Respondent in that case, United States Service Industries, Inc. ("Respondent") hired its predecessor's employees as it was required under the

District of Columbia's Displaced Workers Protection Act ("DCDWPA").
After the Respondent refused to bargain with the union representing
those employees, the union brought a claim against the Respondent
for violating Section 8(a)(1) and (5) of the NLRA.  United States
Serv. Indus., Inc., 1995 WL 1918207 at *3.

The General Counsel took the position that the Respondent
qualified as a successor employer within the meaning of NLRB v.
Burns Int'l Security Serv., Inc., 406 U.S. 168 (1972).  The
Respondent readily agreed that there was "substantial continuity"
between the two employing enterprises (in general, providing
janitorial services for the Judiciary Plaza office building).  The
Respondent maintained, however, that "it did not hire [its
predecessor's] employees at the Judiciary Plaza building because it
consciously decided to take advantage of its predecessor's trained
workforce but because the [DCDWPA] forced it to hire those
employees."  United States Serv. Indus., Inc., 1995 WL 1918207 at
*3.  Noting that this argument presented a policy question of first
impression, the ALJ concluded that "[b]ecause the Board has never
formally adopted a requirement that a successor employer must
consciously decide to avail itself of its predecessor's trained
workforce in order to be considered a Burns' successor employer, I
reject Respondent's initial argument."  Id. at 3.  The ALJ held
that "Respondent was a Burns' successor to [its predecessor] and
therefore succeeded to [its predecessor's] collective bargaining
obligations."  Id. at 5.

Against this limited background, it is not entirely clear

whether a requirement to retain, at least for a 90 day period, all those of a predecessor's employees who qualify under a worker retention statute, will automatically result in an immediate obligation of the new business employer to participate in collective bargaining.  In the present case, counsel for the *amici*, which include the Union representing service employees working at two of the affected hospitality businesses, expressly recognized that, in case of an involuntary retention, the bargaining obligation does not mature until the employer chooses to retain the employees on the ninety-first day.  However, counsel for the *amici* also acknowledged that the Union would likely take the position that a new employer should engage in bargaining before unilaterally changing the terms of employment which had previously been negotiated. [17]

The Ordinance impacts, without question, the ability of a new business employer to make independent hiring decisions upon assuming ownership or management duties related to affected hospitality businesses.  Under the current version of the Ordinance, the new employer is required to retain its predecessor's employees (to the extent they meet the Ordinance's requirements) for a limited period of 90 days.  However, under the provisions of

---

[17]

To be sure, a hospitality business entity which acquires a business affected by the Ordinance will likely do so with the understanding that it is required to retain as many of its predecessor's qualifying employees as it needs.  To the extent such entity chooses to proceed with the acquisition, it could certainly be argued that the retention of employees cannot entirely be described as "involuntary."

the Ordinance, the new employer is not bound by an existing CBA and it is free to impose its own wages and other initial terms of employment. In addition, the new employer has the ability to dismiss employees for cause or because they are not required "for its full operation," which may or may not be at the level previously conducted by the predecessor. Once the 90-day period has passed, nothing in the Ordinance requires the new employer to retain its predecessor's employees, although it may be precluded from terminating employees based on union membership, see, e.g. Capital Cleaning Contractors, Inc. v. NLRB, 147 F.3d 999, 1008 (D.C.Cir. 1998). Likewise, the Ordinance does not impose an immediate obligation on the new employer to engage in collective bargaining, which is consistent with the positions taken by counsel for the *amici* and by General Counsel in M&M Parkside.

Although the NLRB has not yet developed a consistent position, existing case law indicates that the successor employer will be obligated to bargain with the Union only if the successor employer retains its predecessor's employees beyond the mandatory employment period or if it extends an offer for permanent employment prior to expiration of the mandatory retention period.

This is a close case. Although the City and the *amici* maintain that the Ordinance merely imposes a "minimum labor standard" not subject to NLRA preemption, the cases they cite in support are distinguishable from the case in question. In Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the Supreme Court rejected an employer's

challenge to a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing.  In Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S. Ct. 2380, 85 L.Ed.2d 728 (1985), the challenged statute required that minimum mental health benefits be provided under certain health insurance policies.  In Int'l Paper Co. v. Town of Jay, 928 F.2d 480 (1st Cir. 1991), although the ordinance at issue appeared to have been enacted to impact the affected industry's bargaining power, it primarily served to protect the public by regulating emission of pollutants.  Both Fort Halifax and Metropolitan Life involved statutes that constituted true minimum labor standards which "affect[ed] union and nonunion employees equally and which neither encourage[d] nor discourage[d] the collective-bargaining processes that are the subject of the NLRA." Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. at 755, 105 S.Ct. at 2397, 85 L.Ed.2d 728.  International Paper involved an environmental protection statute unrelated to labor standards.

In contrast, the Ordinance in this case provides employees of certain hospitality businesses the protective benefit of temporary employment in the event of a change in employer.  It also carries with it the potential for additional and continuing obligations to new employers, e.g. to engage in collective bargaining.  As such, it cannot be simply characterized as a "minimum labor standard." However, the Ordinance does not preclude an employer from making its own hiring decisions after the initial 90-day retention period, nor does it compel a successor employer to honor the terms of a CBA

negotiated by its predecessor.  Instead, the Ordinance, which applies to all qualifying employees of affected hospitality businesses, regardless of whether they are members of a union, merely provides such employees with 90 days' continued employment after a change in their employer.  Such continuing employment is at the terms set by their new employer and is subject to termination, should their services not be required to keep the business fully operational and to dismissal for cause.  As such, the Ordinance is primarily designed to provide temporary job protection to both unionized and nonunionized employees which does not constitute a significant intrusion into the equitable collective bargaining process established by the NLRA.

B.  Violation of the Contract Clause

The plaintiffs assert that the Ordinance "effects a substantial impairment of a contractual relationship by requiring a new employer to retain a predecessor's employees for three months and subject to good-cause termination only, thereby establishing terms and conditions of employment to which the new employer did not agree."  Pltfs.' Mem. 25.  The City, on its part, maintains that the Ordinance does not violate the Contracts Clause "because it concerned an area that was heavily regulated and considered [to be] within the legitimate police powers of a municipality."  City's Mem. at 3.

The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts. . ."  U.S. Const. Art. I, § 10, cl. 1.  "Although the language of the Contract

Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 410, 103 S.Ct. 698, 704, 74 L.Ed.2d 569 (1983). The Supreme Court has noted that "the Contract Clause does not operate to obliterate the police power of the States," which is "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978)). To that end, a State may exercise its police power "for the promotion of the common weal, or . . . for the general good of the public, though contracts previously entered into between individuals may thereby be affected." Id.

The threshold inquiry of a Contract Clause claim is "'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" Energy Reserves Group, Inc., 459 U.S. at 411, 103 S.Ct. at 704 (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. at 244, 98 S.Ct. at 2722, 57 L.Ed.2d 727 (1978)). To make that determination, a court first must inquire whether (1) a contract exists; (2) the law in question impairs an obligation under the contract; and (3) the impairment is substantial. General Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992). To determine whether the impairment is substantial, courts consider, *inter alia*, "whether the industry the complaining party has entered has been

regulated in the past." <u>Energy Reserves Group, Inc.</u>, 459 U.S. at 411, 103 S.Ct. at 704.

In the event the state law is found to constitute "a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation . . . such as the remedying of a broad and general social or economic problem." <u>Id.</u> at 411-412, 103 S.Ct. at 704-705. This requirement "guaranties that the State is exercising its police power, rather than providing a benefit to special interests." <u>Id.</u> Finally, "[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" <u>Id.</u> (quoting <u>United States Trust Co. v. New Jersey</u>, 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977)).

Both parties have identified the contracts at issue as the CBA entered by The Westin, which expired in October 2009 and certain agreements between the Union and the Biltmore, and the Renaissance Providence, respectively. The Ordinance imposes an obligation on these parties to retain current employees for at least three months after a "change in identity of the hospitality employer." Although this provision would also apply to new buyers of a hospitality business, who may not yet be a party to an existing contract, it may also apply to these three parties, <em>e.g.</em>, in the event there is a change in their respective management contracts.

The plaintiffs' argument that the Ordinance imposes "terms and conditions of employment to which the new employer did not agree" is against the plain language of the Ordinance, which provides that the predecessor's existing employees must be retained for a three-month period "under the terms and conditions established by the hospitality business buyer or manager or as required by law." Ordinance (c)(1). The plaintiffs' position is also inconsistent with precedent established by <u>Burns</u> and its progeny. The Ordinance does not affect the terms of existing CBAs, nor does it impose initial terms of employment on a successor employer unless the new employer's conduct qualifies it as a "clear successor," *e.g.*, by extending firm offers of employment to existing employees. Whether the retention provision of the Ordinance is likely to result in additional bargaining obligations to new business hospitality employers depends on whether the new employer continues to retain its predecessor's employees voluntarily. Only when such employment is voluntarily extended beyond the 90 days (or when the successor's intent of continued employment is expressed) does the obligation to bargain arise. Even if this were to impact existing contracts entered into by the affected business entities, such limited imposition on a new employer, when weighed against the temporary protection of the employees, is not sufficient to constitute a substantial impairment to existing contractual relationships of the affected parties.

C.  Violation of the Equal Protection Doctrine

The plaintiffs allege that, while the Ordinance's purpose of

"bolster[ing] Providence as a tourist destination" may be a legitimate interest, its "arbitrary focus on a narrow slice of the tourist industry is impermissible under the Equal Protection doctrine." Pltfs' 30. Particularly, the plaintiffs charge that the Ordinance "single[s] out specific entities and encumber[s] them with costly and burdensome regulations that other similar entities, competing in the same market, do not have to endure." Pltfs' Mem 30.

The City takes the position that the Ordinance does not "violate equal protection because it [is] nearly self-evident that it [is] rationally related to a legitimate government purpose." City's Mem. 3. The City also suggests that "a governmental decision to regulate one business differently from another is 'virtually unreviewable.'" City's Mot. 29 (quoting <u>F.C.C. v. Beach Communications, Inc.</u>, 508 U.S. 307, 316, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993)).

A distinction between two similarly situated groups by a state or political subdivision is "subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment."[18] <u>LCM Enterprises, Inc. v. Town of Dartmouth</u>, 14 F.3d 675, 678-679 (1st Cir. 1994). It is well established that "[l]egislation or regulation which neither employs a suspect classification nor impairs fundamental rights, will survive constitutional scrutiny, provided the remedy

---

[18]

The Equal Protection Clause provides: "No State shall . . . deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

is 'rationally related' to a legitimate governmental purpose."
Medeiros v. Vincent, 431 F.3d 25, 29 (1st Cir. 2005). "Once a
rational basis is identified," the challenged legislation must be
upheld even "when there is no empirical data in the record to
support the assumptions underlying the chosen remedy." Id. ;
Donahue v. City of Boston, 371 F.3d 7, 15 (1st Cir. 2004)(court
will uphold challenged classification "so long as the state
articulates 'some reasonably conceivable state of facts that could
provide a rational basis for the classification.'"); Starlight
Sugar, Inc. v. Soto, 253 F.3d 137, 145 (1st Cir. 2001)("[C]ourts
will uphold legislation that provides for differential treatment
upon a mere showing of a rational relationship between the
disparate treatment and a legitimate government objective."). Wine
and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 53 (1st
Cir. 2005)(holding that "[u]nder that standard, an inquiring court
must uphold the legislation as long as the means chosen by the
legislature are rationally related to some legitimate government
purpose"). A municipality is entitled to "substantial latitude to
establish classifications that roughly approximate the nature of
the problem perceived." Medeiros v. Vincent, 431 F.3d at 31. The
presumption can be overcome only if it is demonstrated that "'there
exists no fairly conceivable set of facts that could ground a
rational relationship between the challenged classification and the
government's legitimate goals.'" Wine and Spirits Retailers, Inc.
v. Rhode Island, 418 F.3d at 53-54 (quoting Eulitt v. Maine, Dept.
of Educ., 386 F.3d 344, 356 (1st Cir. 2004)).

Under this standard, a challenger of disputed legislation faces an uphill battle. The State or local legislating authority "need only articulate some 'reasonable conceivable set of facts' that could establish a rational relationship between the challenged laws and the government's legitimate ends." Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003). Such facts "need not be supported by any evidentiary record." Id. (citing Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification"); Beach Communications, 508 U.S. at 315, 113 S.Ct. 2096)("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.")).

The Ordinance at issue in this case is an economic regulation which neither involves suspect classifications nor fundamental rights. As such, it is subject to the "rational basis" test. Primarily, the Ordinance distinguishes between Providence hotels with at least 25 rooms and other businesses which are tourism and/or hospitality business related.[19]

---

[19]

The plaintiffs' equal protection claim is limited to asserting that the Ordinance "impermissibly differentiates between businesses that engage in 'hotel service' and those that engage in every other kind of business." Complaint ¶ 59. The Court notes, however, that the Ordinance also draws a distinction between a small group of only three particular hotels and the rest of the affected hotels by making the Ordinance retroactively effective only with respect to the former. Ordinance Sec. 2. The Ordinance itself does not provide a rationale for such a distinction. However, because the plaintiffs have not made a separate claim regarding this distinction, nor have they addressed this issue in their memoranda

In support of such distinction, the City asserts in its memoranda that it is "nearly self-evident" that the Ordinance is rationally related to a legitimate government purpose, City's Mem. 3. City's Reply Mem 9-10.  At oral argument, the City explained that recent labor unrest at the Westin had, on a number of occasions, very publicly created a disincentive to conventions; that a national conference of mayors was almost relocated as a result; and that extensive press coverage of that labor issue had created a disincentive for people to visit.

The plaintiffs, on their part, state that the Ordinance puts the affected hotels "in competitive disadvantage with hotels in other cities, including Warwick, Newport, and others" and that "[o]f all the employees working in the hospitality and tourism industry in the City, only those working within the identified hotels are affected, and even those employees are only affected upon a change in identity of the entity."  Pltfts.' Mem. 29-30. The plaintiffs' arguments miss their mark.  In a rational basis analysis, once the City has identified a rational basis, the burden is on plaintiffs, as the challengers of the Ordinance, to demonstrate that there exists no fairly conceivable set of facts that could ground a rational relationship between the provisions of the Ordinance and the City's legitimate goals.  <u>Medeiros v. Vincent</u>, 431 F.3d at 31.  The disparate impact on Providence hotels compared with those in other cities is speculative and not really

---

or at oral argument, the Court considers the issue waived and will not further discuss it herein.

relevant to the analysis.  Moreover, as recognized by the First Circuit, "[a] statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages." Medeiros, 431 F.3d at 31-32.

The City has articulated the connection between its stated goal of bolstering Providence tourism and the worker retention provision of the Ordinance. The plaintiffs, on the other hand, have not offered a compelling argument that there can be no rational relationship between the provision and the City's interest under any conceivable scenario. Since the Court is precluded from fact finding in this analysis, and given the deference that must be afforded to the legislating body and the high threshold which the challenging party to an economic regulation must overcome, the Court is of the opinion that the distinction between the affected hospitality businesses and other hospitality and tourism businesses is not violative of the Equal Protection Clause.

D.   Authority under Home Rule Charter

The plaintiffs assert that the Ordinance exceeds the City's authority to legislate under its "Home Rule Charter." Pltfs.' Mem. 30.  Specifically, the plaintiffs argue that the City's authority to legislate is limited to purely local concerns; that tourism, however, is a matter for statewide concern and, therefore, "outside the Home Rule Charter powers of the City Council to legislate." Id. at 33.  The City, conceding that "the health of the tourism industry, generally speaking, is of statewide concern," takes the position that tourism "is not an industry where uniform regulation

throughout the state is necessary or desirable." City's Mem. 4. The City also maintains that minimum labor standards are not traditionally within the exclusive domain of the state, and that "the Ordinance would not have had any meaningful effect on businesses outside Providence." Id.

Pursuant to Article 13 of the Rhode Island Constitution, cities and towns have the authority to "legislate with regard to all local matters." Amico's Inc. v. Mattos, 789 A.2d 899, 903 (R.I. 2002); R.I. Const. art. 13, sec.1, sec. 2.[20] However, such legislative authority is limited and it excludes matters of statewide concern. Westerly Residents for Thoughtful Development, Inc. v. Brancato, 565 A.2d 1262, 1264 (R.I. 1989)("Municipalities may not, however, legislate on matters of statewide concern. The power of the General Assembly remains exclusive in those areas."). Accordingly, the Rhode Island General Assembly "continues to retain 'the power to act in relation to the property, affairs and government of any city or town by general laws which shall apply alike to all cities and towns, but which shall not affect the form

---

[20] Article 13 of the Rhode Island Constitution provides:

**Section 1. Intent of article**
It is the intention of this article to grant and confirm to the people of every city and town in this state the right of self government in all local matters.

**Section 2. Local legislative power** Every city and town shall have the power at any time to adopt a charter, amend its charter, enact and amend local laws relating to its property, affairs and government not inconsistent with this Constitution and laws enacted by the general assembly in conformity with the powers reserved to the general assembly.

of government of any city or town.'" <u>Amico's Inc. v. Mattos</u>, 789 A.2d at 903 (quoting R.I. Const. art 13, sec. 4). In addition, the General Assembly alone retains the authority to legislate regarding "education, elections, and taxation, thereby precluding any municipality's foray into these areas, absent specific legislative approval." <u>Amico's Inc. v. Mattos</u>, 789 A.2d at 903 (listing cases); <u>Westerly Residents for Thoughtful Development, Inc. v. Brancato</u>, 565 A.2d at 1264 ("[M]atters of statewide concern include 'the regulation of police affairs, the conduct of business, licensing, education, and elections.'")(quoting <u>Bruckshaw v. Paolino</u>, 557 A.2d 1221, 1223 (R.I. 1989)).

Article I, section 103 of the Providence Home Rule Charter of 1980 provides:

> The city shall have all powers of local self-government and home rule and all powers possible for a city to have under the Constitution and the laws of the state, including the power and authority to act in all local and municipal matters and to adopt local laws and ordinances relating to its property, affairs and government.

Pursuant to article IV, section 401, the Providence City Council is empowered to "enact such ordinances as the city council may consider necessary to insure the welfare and good order of the city and to provide penalties for the violation thereof."

Although it is well established that the authority of cities and towns is limited to local concerns and may not be extended to areas that remain exclusively within the legislative powers of the state, the line between those areas is not clearly defined. <u>Town of East Greenwich v. O'Neill</u>, 617 A.2d 104, 111 (R.I. 1992)(noting

that "absent a direct conflict between a local ordinance and a state statute, 'the constitution and general laws are devoid of guidelines defining the parameters of "local" and "general" legislation.'"). To help "define the limits of the local-general equation," the Rhode Island Supreme Court directed the focus of its analysis on three variables in O'Neill:

> "First, when it appears that uniform regulation throughout the state is necessary or desirable, the matter is likely to be within the state's domain. . . Second, whether a particular matter is traditionally within the historical dominion of one entity is a substantial consideration. . . Third, and most critical, if the action of a municipality has a significant effect upon people outside the home rule town or city, the matter is apt to be deemed one of statewide concern."

Town of East Greenwich v. O'Neill, 617 A.2d at 111 (citations omitted).

The Ordinance at issue in the present case primarily imposes an obligation on a new hospitality employer to retain its predecessor's employees for a minimum period of three months. The provision comes into play only when one of the qualifying hospitality businesses is purchased, sold, or leased or when a management contract or lease is terminated. According to the City, the worker retention requirement is intended to "bolster Providence as a tourist destination, and to promote the stability of Providence's hospitality and tourism businesses." Ordinance Section 1(a).

The plaintiffs suggest that the state's enactment of Chapter 63.1 (related to tourism and development) indicates that "the

General Assembly considers tourism a matter of statewide concern";
however, they do not allege that the Ordinance conflicts with any
tourism related state law.  Pltfs.' Mem. 32-33.  The plaintiffs'
reliance on Amico's Inc. v. Mattos in their argument is misplaced.
Although the Rhode Island Supreme Court determined in Amico's Inc.
v. Mattos that the Town of East Greenwich did not have the
authority under its Home Rule Charter to condition licensure of
liquor and food establishments on enactment of smoking regulations,
that determination was based on the General Assembly's exclusive
power of the licensing of Rhode Island businesses.  Amico's Inc. v.
Mattos, 789 A.2d at 903.  The Court explained that, "irrespective
of whether the regulation of smoking in local establishments is a
matter of local concern, . . . the power to regulate businesses
through licensing is an attribute of the state. . ."  Id. (Emphasis
added).

     With respect to "a significant effect upon people outside"
Providence, the plaintiffs assert that "Providence has a tremendous
economic impact on the people of Rhode Island;[21]" however, they do
not address how the Ordinance itself would impact other communities
within the state.  Pltfs.' Mem. 32.  As such, the temporary
retention of hospitality employees following a change in the
ownership or management of certain hotels within the City of

---

[21]

     The parties agree that more than 28 percent of the money spent
on travel and tourism in Rhode Island is spent in Providence.  SOF
¶ 15.

Providence is a local concern and the implementation of the Ordinance was within the City Council's legislative authority.

## Conclusion

For the reasons set forth above, the Court finds that the Ordinance is valid. Therefore, the Court DENIES the plaintiffs' request for a declaratory judgment that (1) the Ordinance is preempted by the NLRA; (2) the Ordinance is in violation of the Contracts Clause of the Constitution; (3) the Ordinance is in violation of the Equal Protection Clause of the Constitution; and (4) the Ordinance is in violation of the Providence Home Rule Charter. Entry of judgment on behalf of the City is ordered herewith.


SO ORDERED.


/s/ Mary M. Lisi

Mary M. Lisi
Chief United States District Judge

March 31, 2011